*RECOMMENDED FOR FULL-TEXT PUBLICATION*
*Pursuant to Sixth Circuit Rule 206*

ELECTRONIC CITATION: 2001 FED App. 0033P (6th Cir.)
File Name: 01a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

MARIO ROSALES-GARCIA,
      *Petitioner-Appellant,*

      *v.*

J.T. HOLLAND, Warden,
      *Respondent-Appellee.*

No. 99-5683

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 98-00286—Karl S. Forester, District Judge.

Submitted: August 4, 2000

Decided and Filed: January 31, 2001

Before: MOORE and CLAY, Circuit Judges; RICE,
District Judge.*

————————————

## COUNSEL

**ON BRIEF:** Emily A. Radford, Allen W. Hausman,
UNITED STATES DEPARTMENT OF JUSTICE

———————————————

* The Honorable Walter Herbert Rice, Chief United States District
Judge for the Southern District of Ohio, sitting by designation.

1

IMMIGRATION LITIGATION, CIVIL DIVISION, Washington, D.C., for Appellee. Mario Rosales-Garcia, Lexington, Kentucky, pro se.

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. RICE, D. J. (pp. 40-63), delivered a separate dissenting opinion.

────────────────

**OPINION**

────────────────

KAREN NELSON MOORE, Circuit Judge. This case presents the difficult and complex question whether an excludable alien has a liberty interest recognized by the Fifth Amendment's Due Process Clause when the Immigration and Naturalization Service ("INS") seeks to detain him in custody, perhaps indefinitely, without charging him with a crime or affording him a trial but simply on the ground that it cannot effect his deportation. On July 9, 1998, Petitioner-Appellant Mario Rosales-Garcia ("Rosales") applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the Eastern District of Kentucky. He sought relief from the Attorney General's decision on March 24, 1997 denying him parole from his detention at the Federal Medical Center in Lexington, Kentucky, or in the alternative, an emergency hearing before the Cuban Review Panel and the INS. Rosales is a Cuban citizen who arrived in this country during the Mariel boatlift in 1980. Because he has been declared excludable by the INS he would ordinarily be deported to his home country; however, the United States is unable to effect his deportation because Cuba refuses to accept his return. Thus, Rosales, after completing a federal prison sentence, has been taken into INS custody pending an agency determination that he is eligible for parole or that Cuba will allow him to enter. Rosales, appearing *pro se*, asserts that both his substantive and procedural due process rights under the Constitution are being violated by the Attorney General and the INS. The district court dismissed his petition with prejudice, and Rosales promptly appealed to

*Betancourt v. Chandler*, 230 F.3d 1357, 2000 WL 1359634 at *2 (6th Cir. Sept. 14, 2000) (unpublished), a panel of this court recently recognized that excludable aliens are entitled to only those procedural rights provided by 8 C.F.R. § 212.12, not the Constitution. Absent a violation of § 212.12, which Rosales has not demonstrated, he has no procedural due process claim.

For the reasons set forth above, I respectfully dissent.

Rather, Rosales appears to argue that the INS violated procedural due process rights emanating from the Constitution.[19] Stated differently, Rosales suggests that the immigration parole procedure contained in 8 C.F.R. § 212.12 is itself deficient because it does not afford him certain due process rights guaranteed by the Constitution.[20] However, in

---

[19] As the majority properly notes, Rosales alleged in his habeas petition that he was deprived of his Fifth and Fourteenth Amendment rights (1) to be represented by counsel at the parole hearing, (2) to review the information used against him at that proceeding, and (3) to confront and cross-examine witnesses. Rosales also alleged that the INS had miscalculated his parole candidacy score. In particular, he alleged that the INS had improperly enhanced his score to account for prior criminal offenses, *not* in violation of 8 C.F.R. § 212.12, but rather in violation of the Federal Rules of Evidence, Title 28 of the United States Code and the United States Sentencing Guidelines. J.A. at 6-7. Rosales did allege in his habeas petition, however, that the INS had violated 8 C.F.R. § 212.12 by relying upon impermissible reasons to support its denial of immigration parole. J.A. at 7. Although Rosales does not appear to pursue this claim on appeal, it lacks merit in any event. The INS denied Rosales immigration parole largely because it was unable to conclude that he would not pose a threat to the community, as evidenced by his recidivist criminal behavior. J.A. at 133. This explanation plainly constitutes a proper basis to deny immigration parole. *See* 8 C.F.R. § 212.12(d).

[20] Insofar as Rosales's appellate brief might be read to assert a violation of 8 C.F.R. § 212.12, any such claim is belied by the record. Among other things, he has been afforded periodic parole review, the services of a translator during his parole interview, decisions translated into Spanish, and notice of his right to have the assistance of a representative during his parole interview. J.A. at 130-139. Although Rosales stresses that he was not represented by counsel during the parole review process, § 212.12 does not guarantee such a right. Furthermore, this court has recognized that an excludable alien has "no constitutional right to counsel at his parole review hearings." *Fernandez-Santana v. Chandler*, 202 F.3d 268, 1999 WL 1281781 at *2 (6th Cir. December 27, 1999) (unpublished). Rosales also contends that, as a result of a language barrier, he was unable "to understand or communicate in lay or legal terms with his keepers." As noted above, however, Rosales was informed of his right to have a representative assist with his parole interview. J.A. at 131.

---

this court. We **REVERSE** the district court's judgment, order Rosales's release, and **REMAND** to the district court for proceedings in accordance with this opinion.

## I. Background

### A. Facts and Procedure

Rosales left Cuba, his birthplace, and arrived in this country around May 6, 1980 as part of the Mariel boatlift, so known because over 120,000 undocumented Cubans departed from the Mariel Harbor en route to the United States. Although Rosales was initially detained by immigration authorities, he was released into the custody of his aunt on May 20, 1980, pursuant to the Attorney General's authority to parole illegal aliens for humanitarian or other reasons under 8 U.S.C. § 1182(d)(5)(A) (1994).[1] J.A. at 97-110 (Request for Asylum, Passport). Rosales was subsequently arrested multiple times[2] and was convicted of several of the offenses including: possession of marijuana and resisting arrest in October 1981, J.A. at 146-47; grand theft in September 1981, for which he received two years' probation in March 1983, J.A. at 174; burglary and grand larceny in October 1983, for

---

[1] The statute read in pertinent part: "The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (1994) (amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 602(a), Pub. L. 104-208, 110 Stat. 3009 (1996)).

[2] Rosales was first arrested in 1980 for aggravated battery. That charge was dismissed. J.A. at 145. He was arrested for other offenses, including possession of marijuana, burglary, and loitering, but apparently he was not convicted of those offenses. J.A. at 147-54.

which he received two six-month sentences to be served concurrently, J.A. at 152-53, 175; and escape from a penal institution in February 1984, J.A. at 177, where he had been serving time for his previous convictions.  On January 9, 1986, Rosales received a sentence of 366 days for the escape charge after he pleaded guilty.  J.A. at 155, 181.

Rosales's immigration parole was revoked on July 10, 1986 by the INS, pursuant to its authority under 8 U.S.C. § 1185(d)(5)(A) and 8 C.F.R. § 212.5(d)(2), for the escape and grand larceny charges.  J.A. at 111-13.  In a separate proceeding before an immigration judge in Atlanta, Georgia, on June 26, 1987, Rosales was denied asylum and deemed excludable[3] from this country because he lacked a visa or other documentation entitling him to admission and because he had been convicted of state crimes in Florida.  J.A. at 115.  Rosales remained in immigration custody until he was considered for immigration parole a second time on April 5, 1988.  J.A. at 120.  He was released on May 20, 1988 to the custody of his uncle in Miami.  J.A. at 122-25.  Rosales was not deported at that time, however, because Cuba refused to take him back.

On March 18, 1993, Rosales pleaded guilty to one count of conspiracy to possess with the intent to distribute cocaine in the United States District Court for the Eastern District of

---

[3]Before the enactment of IIRIRA, aliens ineligible for admission into the United States were designated "excludable" aliens.  *See* 8 U.S.C. § 1182(a) (1994).  Excludable aliens who were granted "parole" by the Attorney General could then enter the country.  If an excludable alien's parole was revoked, exclusion proceedings would be brought to deport him. *See* 8 U.S.C. § 1182(d)(5)(A) (1994).  These aliens are now referred to as "inadmissible" aliens.  *See* 8 U.S.C. § 1182(a).  Aliens who had gained admission into the United States but were here illegally were designated "deportable" aliens.  *See* 8 U.S.C. § 1251 (1994).  They could be removed from this country by deportation proceedings.  *See* 8 U.S.C. § 1252 (1994).  Proceedings to remove both inadmissible and deportable aliens are now referred to as "removal" proceedings.  *See* 8 U.S.C. § 1229a.   Inadmissible aliens are removable under 8 U.S.C. § 1227(a)(1)(A).   Under the prior statutory scheme, Rosales was an "excludable" alien.

annual review for purposes of determining his eligibility for immigration parole.[18]

Based on the reasoning and citation of authority set forth above, I conclude that Rosales lacks a liberty interest in freedom from continued detention by the INS.  Even assuming, arguendo, that he does possess such an interest, I find that it is outweighed by the government's regulatory interest in enforcing immigration laws and providing for public safety. Consequently, Rosales's indefinite confinement does not violate substantive due process.

In conclusion, I pause briefly to note my agreement with the district court's determination that Rosales's procedural due process rights have not been violated. Although the majority fails to reach this issue, given its finding of a substantive due process violation, the Supreme Court has recognized that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff*, 338 U.S. at 544; *see also Mezei*, 345 U.S. at 212. Consequently, the district court properly examined the Attorney General's Cuban Review Plan, found at 8 C.F.R. § 212.12, to identify the procedural rights at issue. *See, e.g., Garcia-Arena v. Luttrell*, – F.3d –, 2000 WL 1827855 at *2 (6th Cir. Dec. 8, 2000) (unpublished) (recognizing that excludable aliens are entitled to only the procedural rights provided by 8 C.F.R. § 212.12).

The crux of Rosales's argument on appeal does not appear to be that the INS violated the procedure set forth in 8 C.F.R. § 212.12 when it declined to grant him immigration parole.

---

[18]The majority appears to find a substantive due process violation in part because Rosales cannot be "certain" of receiving immigration parole, regardless of how well he behaves while he is detained. Given that Rosales has no right to enter this country at all, however, the fact that he cannot be "certain" of being paroled into the United States does not give rise to a substantive due process violation.

In opposition to the foregoing conclusion, the majority reasons that "the strength of the government's interest in protecting the community and enforcing its immigration laws must be considered in relation to the possibility that the government may actually achieve its goal to effect Rosales's deportation." Given that Rosales is unlikely ever to be returned to Cuba, the court concludes that the strength of the government's interest diminishes to the point that it is outweighed by Rosales's liberty interest in freedom from bodily restraint. Specifically, the majority states that "Rosales's confinement can only be considered excessive in relation to the purpose of protecting the community from danger and enforcing an immigration order that is, at present, unenforceable."

By detaining Rosales, however, the government *is enforcing* immigration law and the order excluding Rosales from this country. Under the entry fiction, the applicability of which the majority does not dispute, Rosales is being detained at the border because he has no legal right to enter this country. He continues to have no legal right to enter this country, regardless of how long he remains waiting at the border. Therefore, by refusing to release Rosales into the United States, the Attorney General is unquestionably enforcing immigration policy, which includes not only deporting him but also excluding him. The fact that Cuba will not accept his return does not alter the fact that the government is enforcing both its immigration law and Rosales's order of exclusion simply by ensuring his exclusion from U.S. territory. Indeed, the *only* way that U.S. immigration policy and the order of exclusion will be rendered "unenforceable" is if this court orders an excludable alien such as Rosales to be released into the general population. Finally, the fact that Cuba will not accept Rosales's return does not alter the fact that the government is ensuring public safety by detaining Rosales, a person who has committed felony offenses in the United States, subject to

Wisconsin; he was sentenced to 63 months in federal prison, followed by five years of supervised release. J.A. at 159-61. While Rosales was serving his sentence, the INS lodged a detainer against him, directing prison officials to release him to INS custody for deportation proceedings at the completion of his sentence. J.A. at 126-27. On March 24, 1997, prior to his release, Rosales's immigration parole was again revoked pursuant to the regulations governing parole of Mariel Cubans at 8 C.F.R. § 212.12 (the "Cuban Review Plan").[4]  *See* 8 C.F.R. § 212.12(a). When Rosales was released from prison on May 18, 1997, the INS promptly detained him and took him into custody, pursuant to its authority under

---

[4] Because of the lack of an agreement with Cuba for the return of Mariel Cubans, the Attorney General adopted the Cuban Review Plan, at 8 C.F.R. §§ 212.12-.13, in 1987 to govern the grant and revocation of parole to all Cubans who arrived in the United States between April 15, 1980 and October 20, 1980. Under the Plan, the authority to grant parole for detained Mariel Cubans rests with the INS Commissioner, who may act through an Associate Commissioner for Enforcement. *See id.* § 212.12(b)(1). The Associate Commissioner must appoint a Review Plan Director who designates two- or three-person panels (the "Cuban Review Panel") to make parole recommendations to the Associate Commissioner. The regulations provide for the annual review of a detainee's status. *See id.* at § 212.12(g)(2). Before making a recommendation that a detainee be granted parole, the Cuban Review Panel members "must conclude that: [1] The detainee is presently a nonviolent person; [2] The detainee is likely to remain nonviolent; [3] The detainee is not likely to pose a threat to the community following his release; and [4] The detainee is not likely to violate the conditions of his parole." *Id.* § 212.12(d)(2).

Each panel must weigh the following factors when making its decisions: "[1] The nature and number of disciplinary infractions or incident reports received while in custody; [2] The detainee's past history of criminal behavior; [3] Any psychiatric and psychological reports pertaining to the detainee's mental health; [4] Institutional progress relating to participation in work, educational and vocational programs; [5] His ties to the United States, such as the number of close relatives residing lawfully here; [6] The likelihood that he may abscond, such as from any sponsorship program; and [7] Any other information which is probative of whether the detainee is likely to . . . engage in future acts of violence, . . . future criminal activity, or is likely to violate the conditions of his parole." *See id.* § 212.12(d)(3).

8 U.S.C. § 1226(e) (1994).[5]  On November 5, 1997, the Associate Commissioner for Enforcement for the INS reconsidered and then denied Rosales immigration parole. J.A. at 133.  The INS rendered its decision on December 12, 1997 and served it on Rosales on February 11, 1998. According to its report, the Cuban Review Panel determined that Rosales had demonstrated "a propensity to engage in recidivist criminal behavior" as reflected by his criminal record and that his responses to questions at his parole interview were "non-credible." J.A. at 133.  The Panel stated that "it is not clearly evident" that releasing Rosales on parole was in the public interest; that he would not pose a threat to the community; or that he would not violate the conditions of immigration parole.[6]  J.A. at 133.  Rosales has remained in custody since that determination, where he continues to receive periodic consideration for parole under the Cuban Review Plan.[7]  *See* 8 C.F.R. § 212.12(g)(2).

Rosales filed his habeas petition with the district court on July 9, 1998.  J.A. at 5.  In his petition, Rosales asserted that his due process rights under the Fifth and Fourteenth Amendments were violated because he was denied his right to be represented by counsel at the Cuban Review Panel hearing on his parole status; to review the information used

---

[5] The statute provided, in pertinent part, that "the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien" from criminal confinement.  8 U.S.C. § 1226(e) (1994).  The parties do not dispute that Rosales's conviction for conspiracy to possess with intent to distribute cocaine was an "aggravated felony" under the statute.

[6] The Review Panel worksheet also reveals that Rosales has demonstrated "good conduct" while in custody and that he has participated in English as a Second Language classes, a drug rehabilitation program, industrial training, automotive training, and has received his GED equivalency.  J.A. at 137.

[7] As of July 19, 2000, Rosales had been determined to be releasable by the INS pending placement in a suitable halfway house.  The effect of this determination is discussed *infra*.

---

non-violent or honor the conditions of parole if released." Protecting society from a potentially dangerous alien is a rational, non-punitive purpose for Alvarez-Mendez's detention. Because such protection requires separating Alvarez-Mendez from society, and because immediate removal from the country is not possible, detention is not an excessive means of accomplishing such protection.

*Id.* at 962.

The Fifth Circuit subsequently cited *Alvarez-Mendez* with approval in *Gisbert*, 988 F.2d at 1442, concluding that the continued detention of Mariel Cubans "is not punishment" and is not excessive in relation to the government's rational purpose of protecting society from potentially dangerous aliens. This is particularly true in the present case, given that Rosales continues to receive annual consideration for immigration parole, despite the fact that he has twice committed serious offenses while on such parole. *Cf. Barrera-Echavarria*, 44 F.3d at 1450 ("When viewed in this light, as a series of one-year periods of detention followed by an opportunity to plead his case anew, we have no difficulty concluding that Barrera's detention is constitutional under *Mezei*."); *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 398 (3rd Cir. 1999) ("We therefore hold that excludable aliens with criminal records as specified in the Immigration Act may be detained for lengthy periods when removal is beyond the control of the INS, provided that appropriate provisions for parole are available."); *Id.* at 399 ("So long as petitioner will receive searching periodic reviews, the prospect of indefinite detention without hope for parole will be eliminated. In these circumstances, due process will be satisfied."); *Zadvydas*, 185 F.3d at 297 n.19 (noting that "the detention of certain classes of persons to protect society at large is not wholly alien to our constitutional order and has been allowed in special situations when, as here, there are procedures to insure that detention must be periodically reviewed").

repatriating them."); *Barrera-Echavarria*, 44 F.3d at 1448 ("A judicial decision requiring that excludable aliens be released into American society when neither their countries of origin nor any third country will admit them might encourage the sort of intransigence Cuba has exhibited in the negotiations over the Mariel refugees.").

Even assuming, arguendo, that a Fifth Amendment liberty interest is implicated, Rosales's detention, which includes annual review for parole eligibility, is not excessive in relation to the government's concern about protecting society from a criminal alien who previously has committed felony offenses while on immigration parole. In *Alvarez-Mendez v. Stock*, 941 F.2d 956 (9th Cir. 1991), the court reached a similar conclusion with respect to a detained Mariel Cuban, applying the balancing-of-interests approach set forth in *Salerno*, 481 U.S. at 747, and adopted by the majority herein. In relevant part, the *Alvarez-Mendez* court reasoned as follows:

> A detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. *White v. Roper*, 901 F.2d 1501, 1504 (9th Cir.1990). Not all detention, however, is punishment. *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 1874 n. 20, 60 L.Ed.2d 447 (1979). In the absence of express intent to punish, the most significant factors in identifying punishment are "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *United States v. Salerno*, 481 U.S. 739, 747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (quotations omitted).

> In denying Alvarez-Mendez reparole, the Associate Commissioner cited Alvarez-Mendez's criminal arrests and convictions, and concluded on the basis of these crimes that it was unlikely that Alvarez-Mendez would "remain

against him at that proceeding; and the right to confront and cross-examine witnesses. Rosales also alleged that the Cuban Review Panel improperly assessed his prior convictions when it calculated his "score" in its assessment of his candidacy for parole, in violation of the regulations governing the Review Panel, at 8 C.F.R. §§ 212.12-13. Finally, Rosales asserted that the decision by the INS was an abuse of discretion, arbitrary and capricious, and that it violated Supreme Court precedent. Rosales sought immediate release on parole, or in the alternative, an emergency hearing at which he would be afforded procedural due process rights.

On October 1, 1998, the district court dismissed the habeas petition sua sponte, concluding that "the petitioner is not being held in violation of the U.S. Constitution or any U.S. law, rule or regulation; thus, the petitioner is not entitled to habeas relief." J.A. at 66, 70. Rosales then filed a motion to alter or amend the judgment on October 21, 1998, stating that he meant to assert his due process rights, not under the Constitution, but under 8 U.S.C. §§ 1101, 1105(a) and 5 U.S.C. §§ 551-701 as well as Supreme Court precedents. J.A. at 13. The district court, construing *pro se* petitions leniently, vacated its earlier decision to dismiss and granted Rosales's motion for reconsideration on December 1, 1998, allowing the case to proceed. J.A. at 71-73.

The government filed a response to Rosales's petition on February 4, 1999, arguing that this case is identical to those that have been rejected by other circuits, including the Sixth Circuit in an unpublished opinion, *Gonzalez v. Luttrell*, No. 96-5098, 1996 WL 627717 (6th Cir. Oct. 29, 1996). The government noted that Rosales had received all the procedure due under the Cuban Review Plan and that his parole had been appropriately denied by the Attorney General. Rosales responded to the government by again asserting his right to be free from indefinite detention and to be afforded procedural due process rights at his parole hearings. J.A. at 58-65. Rosales also sought the appointment of counsel through a motion to the district court, but that request was denied on February 23, 1999. J.A. at 75.

The district court dismissed Rosales's amended petition with prejudice on May 3, 1999. The district court, addressing Rosales's statutory claims first, concluded that Congress had granted total discretionary authority to the Attorney General over immigration matters at 8 U.S.C. §§ 1103(a)(1)[8] and 1182(d)(5)(A). After surveying the recent amendments to the immigration laws and noting Congress's intent to provide the Attorney General with more discretion to detain aliens, the district court concluded that "the Attorney General may continue to detain the instant petitioner in conformity with federal law." J.A. at 88-89 (D. Ct. Op.)

The district court also concluded that Rosales had failed to state a cognizable constitutional claim. The court determined that the Sixth Amendment is not applicable to Rosales's petition "because 'immigration proceedings and detention do not constitute criminal proceedings or punishment.'" J.A. at 89 (internal citations omitted). The court next found that the Fifth Amendment does not "provide excludable aliens with procedural due process rights with regard to admission or parole." J.A. at 89. Thus, the court concluded that Rosales was not due any of the procedures which he sought, namely the right to counsel, to review the information used against him, or to confront and cross-examine people who provided information at his parole hearing. Although the district court noted that "the law is less clear about the extent to which any substantive due process rights are enjoyed by excludable aliens," the court denied Rosales the benefit of the protection of the substantive component of the Fifth Amendment as well. J.A. at 90. The district court observed that Rosales "has no fundamental right to be free to roam the United States and

---

[8]This statute provides that "[t]he Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1).

enter the United States,[16] and the Attorney General has an absolute right to effect his exclusion.[17] "[A] constitutionally protected [liberty] interest cannot arise from relief that the executive exercises unfettered discretion to award." *Tefel v. Reno*, 180 F.3d 1286, 1300 (11th Cir. 1999). Adopting the majority's reasoning would mean that "[a] foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back." *Jean*, 727 F.2d at 975. As a practical matter, such a rule would bestow upon foreign leaders the power to dictate U.S. immigration policy. *Cf. Gisbert*, 988 F.2d at 1447 ("Accepting petitioners' arguments here would allow one country to export its unwanted nationals and force them upon another country by the simple tactic of refusing to accept their return. . . . The United States cannot be forced to violate its national sovereignty in order to parole these aliens within its borders merely because Cuba is dragging its feet in

---

fundamental sovereign authority to control its borders.

[16]"It is beyond dispute that aliens have no constitutional right to be admitted into this county." *Fernandez-Roque*, 734 F.2d at 581 (quoting *Landon*, 459 U.S. at 32); *see also Jean*, 727 F.2d at 972 ("[E]xcludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right."). Immigration "[p]arole is an act of extraordinary sovereign generosity, since it grants temporary admission into our society to an alien who would probably be turned away at the border if he sought to enter by land, rather than coming by sea or air." *Id.*

[17]This is not to say that the Attorney General could detain Rosales indefinitely if some other country were willing to accept him. Under those circumstances, which do not exist here, his continued detention likely would violate the Constitution. In other words, the United States lawfully may detain Rosales in order to regulate its border and prevent him from entering, but it cannot constitutionally prevent him from vacating the border and going elsewhere. Notably, however, Rosales's habeas petition does not suggest that he or his relatives, who are living in Florida, have arranged for him to leave the United States. Instead, he wants to be released into this country.

"long line" of Supreme Court precedent cited by the majority does not controvert the government's reading of *Mezei*, which involved an excludable alien who, under the entry fiction, remained detained at this nation's border and, like Rosales, *was not present* in the United States.[14]

In short, Rosales's substantive due process claim is a victim of the entry fiction. As noted above, that doctrine treats an excludable alien "as one standing on the threshold of entry, and therefore not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States." *Ma*, 208 F.3d at 823. Although Rosales may have a Fifth Amendment liberty interest in not being shot or tortured, he simply has no protected liberty interest in freedom from being detained indefinitely at this country's border.[15] This is so because he has no constitutional right to

---

[14]Despite the fact that the Fifth, Sixth and Fourteenth Amendments have a "territorial theme" and, therefore, apply "'to all persons within the territory of the United States,'" *Plyler*, 457 at 212, some courts have held that excludable aliens may rely upon the Constitution to challenge "governmental action outside of the immigration context." *Fernandez-Roque v. Smith*, 734 F.2d 576, 582 n.8 (11th Cir. 1984); *see also Gisbert*, 988 F.2d at 1442 (recognizing that excludable aliens have a substantive due process right to be free from "gross physical abuse"); *but see Ma*, 208 F.3d at 824 ("[I]t is not settled that excludable aliens have any constitutional rights at all[.]"). Even if excludable aliens may challenge governmental conduct *outside* of the immigration context, however, the act of detaining an alien to effect his exclusion from the United States constitutes governmental action *within* the immigration context. As a result, excludable aliens such as Rosales have no substantive due process right to be free from immigration detention. *See, e.g.*, *Ma*, 208 F.3d at 824; *Carrera-Valdez*, 211 F.3d at 1048.

[15]Preventing the INS from killing or torturing Rosales does not infringe upon the government's plenary power to exclude aliens at our borders. Consequently, as noted, *supra*, some courts have recognized that excludable aliens have a protected liberty interest in not being physically abused. Preventing the INS from indefinitely detaining Rosales in order to ensure his exclusion, however, would interfere with the government's

a fundamental right is the first component of a substantive due process claim." J.A. at 91. The court also found that Rosales's continued detention was "neither arbitrary, conscience-shocking nor oppressive in the constitutional sense." J.A. at 91. Rosales then filed a prompt notice of appeal to this court. J.A. at 95.

In his four-page *pro se* brief to this court, Rosales does not challenge the Attorney General's right to exclude him. Rather, Rosales argues that he should be granted procedural due process rights during his parole revocation hearing and that his substantive due process rights are being violated by the indefinite nature of his detention. In response to the district court's assertion that an excludable alien is not free to "roam" this country, Rosales asserts that he "is not asking for permission to 'roam' the United States." Instead, he claims that he would return to Cuba and that "[i]f he was not part of this 'Catch 22', where he is not allowed to return to his country, he [would] gladly do so." Appellant's Br. at 3.

### B. Relations With Cuba

A brief background on the United States' relationship with Cuba is essential to our analysis. Most of the 125,000 Cuban refugees who came to this country in 1980 in the Mariel boatlift were found excludable because they arrived here without proper entry documents or because they had committed crimes in Cuba. However, a large percentage of these Cubans, including Rosales, were paroled, pursuant to the Attorney General's authority under 8 U.S.C. § 1182(d)(5). According to the affidavit of Michael E. Ranneberger, the Coordinator of the Office of Cuban Affairs in the State Department, who has been responsible for negotiations with Cuba since 1995, "[f]or almost two decades, the United States has been discussing with Cuban authorities the issue of return of excludable Cubans." J.A. at 56. The United States reached a limited agreement with Cuba to repatriate Mariel Cubans in December 1984. Under the terms of this agreement, Cuba consented to the return of 2,746 excludable aliens from the Mariel Boatlift, at the rate of 100 per month,

whom the INS was able to identify at the time the agreement was reached. J.A. at 56 (Ranneberger Decl.); 81 (D. Ct. Op.). Rosales was not among those named in the 1984 Agreement because he was not declared excludable until 1987. Cuba suspended the agreement in May 1985, but agreed to reinstate the agreement in November 1987. *See Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir. 1993). As of January 1999, 1400 Cubans had been returned to Cuba. J.A. at 56 (Ranneberger Decl.).

Further talks between the two countries took place on September 9, 1994 and May 2, 1995. J.A. at 57 (Ranneberger Decl.). The September 1994 agreement stated that the United States and Cuba "agreed to continue to discuss the return of Cuban nationals excludable from the United States." J.A. at 57. Ranneberger noted that discussions between the two countries continued periodically, and while he cannot offer details from these sensitive discussions, he says that he "can confirm that the return of Cuban nationals . . . remains under discussion between the two governments." J.A. at 57.

The United States is currently detaining approximately 1,750 Mariel Cubans in U.S. prison facilities who are neither eligible for parole nor deportable because Cuba will not accept them. *See Chi Thon Ngo v. INS,* 192 F.3d 390, 395 (3d Cir. 1999). According to the government, the United States' position has been and currently is that Cuba is required to take back all of its nationals who are denied admission to the United States. Appellee's Br. at 19.

Without question, aliens who are present in the United States do enjoy significant constitutional protections. In Rosales's case, however, the entry fiction treats him as if he remains detained at the border and *not present* in the United States. *See*, *e.g.*, *Ma*, 208 F.3d at 824 (quoting *Barrera-Echavarria*, 44 F.3d at 1450) (recognizing that "'excludable aliens are deemed under the entry doctrine not to be present on United States territory'"). The majority does not dispute the applicability of the entry fiction herein. Consequently, the

2391-92, 72 L.Ed.2d 786 (1982) (illegal aliens protected by Equal Protection Clause); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (Fourteenth Amendment protects resident aliens). These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country. *See*, *e.g.*, *Plyler*, *supra*, 457 U.S., at 212, 102 S.Ct., at 2392 (The provisions of the Fourteenth Amendment " 'are universal in their application, *to all persons within the territorial jurisdiction* ...' ") (quoting *Yick Wo*, *supra*, 118 U.S., at 369, 6 S.Ct., at 1070); *Kwong Hai Chew*, *supra*, 344 U.S., at 596, n. 5, 73 S.Ct., at 477, n. 5 ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. *But once an alien lawfully enters and resides in this country* he becomes invested with the rights guaranteed by the Constitution to all people within our borders") (quoting *Bridges*, *supra*, 326 U.S., at 161, 65 S.Ct., at 1455 (concurring opinion) (emphasis added)). Respondent is an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not.

*Verdugo-Urquidez*, 494 U.S. at 270-271.

*entered* the United States, either legally or otherwise. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292 (1993); *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976); *Graham v. Richardson*, 403 U.S. 365 (1971); *Wong Wing v. United States*, 163 U.S. 228 (1896); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

When considering the constitutional protection to which an alien is entitled, the Supreme Court has long distinguished between aliens who have entered the United States, even if their presence here is illegal, and aliens who have not yet entered this country. *See, e.g.*, *Yick Wo*, 118 U.S. at 369 (recognizing that the protections of the Fourteenth Amendment extend "to all persons within the territorial jurisdiction" of a state); *Johnson v. Eisentrager*, 339 U.S. 763, 770-771 (1950) (noting that "presence" in the United States gives an alien certain rights, and acknowledging that the Supreme Court has "extended to the person and property of resident aliens important constitutional guaranties"); *Plyler*, 457 U.S. at 212 (recognizing that the Fifth, Sixth and Fourteenth Amendments have a "territorial theme," as the protections provided by those Amendments apply "'to all persons within the territory of the United States,' including aliens unlawfully present"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270-271 (1990) (recognizing that various constitutional protections have been afforded to aliens who are present in the United States, whereas aliens who are not voluntarily within this nation's borders have not been granted the same protections).[13]

---

[13] In *Verdugo-Urquidez*, the Supreme Court reviewed several of the cases cited by the majority herein. According to the *Verdugo-Urquidez* Court, those cases stand for the proposition that aliens enjoy constitutional protections once they enter the United States:

Verdugo-Urquidez also relies on a series of cases in which we have held that aliens enjoy certain constitutional rights. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 211-212, 102 S.Ct. 2382,

## II. Jurisdiction

The government challenged the district court's jurisdiction to hear Rosales's 28 U.S.C. § 2241 habeas petition based on 8 U.S.C. §§ 1252(g)[9] and 1231(h)[10], as well as § 1226(e)[11] and conflicting case law. The district court determined that, in light of this court's decision in *Mansour v. INS*, 123 F.3d 423, 426 (6th Cir. 1997), and the absence of further clarification from this court or the Supreme Court, it had jurisdiction to hear the petition.[12] The government appears to have conceded this court's jurisdiction to hear the instant appeal. Appellee's Br. at 2 (stating that the court of appeals' jurisdiction arises under 28 U.S. C. §§ 1291 and 2253). However, it is our obligation to address the predicate question of our jurisdiction, even when it is not contested, before

---

[9] This section provides: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Chapter." 8 U.S.C. § 1252(g).

[10] This section provides: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

[11] This section provides: "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e).

[12] In *Mansour*, this court noted that because habeas relief was available to aliens seeking review of final deportation orders, the statute denying any court's jurisdiction to review those orders was constitutional. However, this court left undecided the scope of habeas review available to such aliens. *See Mansour*, 123 F.3d at 426 n.3 ("[W]e need not address the scope of review that is available on a petition for a writ of habeas corpus.").

turning to the merits of these appeals.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997).

The Supreme Court's recent decision in *Reno v. American-Arab Anti-Discrimination Committee* ("*AADC*"), 525 U.S. 471 (1999), makes clear that the district court was correct to assert jurisdiction over Rosales's habeas petition; it also establishes the propriety of our jurisdiction to hear Rosales's claim.  In *AADC*, the Supreme Court addressed the scope of 8 U.S.C. § 1252(g) and its ostensibly sweeping jurisdiction-stripping language.[13]  Forced to reconcile the incongruity of several provisions of the IIRIRA which simultaneously grant and deny the right of judicial review to certain aliens who were in deportation proceedings before April 1, 1997, the Supreme Court determined that § 1252(g) must have a "narrow[]" meaning.[14]  *See AADC*, 525 U.S. at 482. Rejecting the idea that § 1252(g) "covers the universe of deportation claims — that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review,'" the Supreme Court restricted § 1252(g) to three discrete actions that the Attorney

---

[13]We do not believe that either 8 U.S.C. § 1226(e) or § 1231(h) limits our jurisdiction over this appeal because these newly enacted provisions under IIRIRA do not govern this case.  *See* IIRIRA § 309(c)(1).

[14]IIRIRA provides that the revised rules governing removal proceedings, as well as judicial review of those proceedings, do not apply to aliens who were already in exclusion or deportation proceedings prior to the Act's effective date on April 1, 1997.  *See* IIRIRA § 309(c)(1). However, IIRIRA § 306(c)(1) makes § 1252(g) applicable to cases "arising from *all* past, pending, or future exclusion, deportation, or removal proceedings" under the Act.  IIRIRA § 306(c)(1) (emphasis added).  Section 1252(g) purports to strip courts of their jurisdiction over most actions by the Attorney General relating to immigration actions "[e]xcept as provided in this section."  However, according to § 309(c)(1), none of the other provisions in § 1252 apply to cases pending before April 1, 1997.  In order to avoid reading § 309(c)(1) into a nullity, the Supreme Court crafted an extremely narrow reading of § 1252(g).  *See Mustata v. U.S. Dep't of Justice*, 179 F.3d 1017, 1020 n.3 (6th Cir. 1999) (explaining the conflict between the provisions in greater depth).

merely explained why the Attorney General had exercised his statutory authority to exclude and to detain Mezei. Notably, a number of other circuit courts have also read *Mezei* as standing for the proposition that an excludable alien has no liberty interest in freedom from indefinite immigration detention.  *See, e.g., Carrera-Valdez*, 211 F.3d at 1048 ("Almost fifty years ago, the Supreme Court held that an excludable alien may be detained indefinitely when his country of origin will not accept his return. . . . Given [*Mezei*] there is little point in elaborate discussion by an inferior court. Carrera is not constitutionally entitled to release."); *Ma*, 208 F.3d at 823 ("While the Court held that Mezei could be detained indefinitely on Ellis Island, because no country would take him back, it rested its holding on the fact that Mezei's exclusion did not violate the immigration statute, and that as an alien who had not yet entered the country he had no other rights."); *Fernandez-Roque*, 734 F.2d at 582.

The majority also asserts that the government's reading of *Mezei* is contrary to "a long line of Supreme Court decisions extending to aliens basic Fifth, Sixth, and Fourteenth Amendment protections . . . ."  Most of the decisions upon which the majority relies, however, involved aliens who *had*

---

decision of the Attorney General to exclude an alien is "final and conclusive[.]" *Id. Second,* Mezei's continued exclusion on Ellis Island did not deprive him of any constitutional right, not because of national security concerns and the Korean War, but because he was treated as if detained outside of U.S. territory and, therefore, he *had no* substantive due process rights. *Id.* at 215; *see also* Ethan A. Klingsberg, Note, *Penetrating the Entry Doctrine: Excludable Aliens' Constitutional Rights in Immigration Processes*, 98 Yale L.J. 639, 643-644 (1989) (recognizing that *Mezei* rests upon the "principle that an alien arrives at the border without an interest in the right to enter" and, as a result, lacks a liberty interest in freedom from immigration detention).  Consequently, the Attorney General's national security concerns were not critical to the *Mezei* Court's substantive due process analysis, despite the majority's assertion to the contrary.

United States depended solely "on the congressional will[.]" *Id.* at 215-216.

Contrary to the majority's assertion herein, the *Mezei* Court did not cite the Korean War and national security concerns as the impetus behind its determination that Mezei's confinement violated no constitutionally protected right. In other words, the Court *did not* suggest that Mezei *would* have had a constitutionally protected liberty interest in freedom from bodily restraint but for the conflict in Korea. To the contrary, the Court found no due process violation because Mezei, an alien seeking initial entry, had no constitutional right to enter the United States at all. *Id.* at 215 ("While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility, resulting hardships . . . persuaded Congress to adopt a more generous course. . . . But such temporary harborage, an act of legislative grace, bestows no additional rights. . . . Thus, we do not think that respondent's continued exclusion deprives him of any statutory or constitutional right."). Absent a constitutional right to enter this country, Mezei simply had no liberty interest in being free from indefinite detention to effect his exclusion. The "exigencies" associated with the Korean War were not crucial to the Court's resolution of this constitutional issue.[12] Rather, those national security concerns

---

[12] It is noteworthy that the Supreme Court did not even require the Attorney General to divulge the evidence upon which he based his determination that Mezei constituted a threat to national security. *Mezei*, 345 U.S. at 212. The Court's refusal to "retry the determination of the Attorney General" by requiring such evidence to be revealed would be peculiar if the absence of a substantive due process right turned upon exigencies attributable to the Korean War. In other words, if the Supreme Court believed that Mezei lacked a substantive due process right to be free from indefinite detention only because of exigencies created by the Korean War, it seems likely that the Court would have required the Attorney General to present *some evidence* showing that those exigencies actually existed. The Court did not do so, however, for at least two reasons. *First*, Mezei's confinement was an act of exclusion, and the

---

General may take: the decision to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." *Id.* The Court noted that "[t]here are of course many other decisions or actions that may be part of the deportation process. . . ." *Id.*

In *Zhislin v. Reno*, 195 F.3d 810 (6th Cir. 1999), we applied the Supreme Court's reasoning in *AADC* and concluded that § 1252(g) did not preclude our review of an alien's petition for habeas corpus challenging the INS's authority to detain him indefinitely. *See Zhislin*, 195 F.3d at 814. Like Zhislin, Rosales does not seek to review the Attorney General's decision to commence or adjudicate a case, nor does he dispute the removal order entered against him. Instead, Rosales challenges "the right of the Attorney General to detain him indefinitely when it appears that circumstances beyond anyone's control will prevent the deportation order from ever being executed." *Id.* Such a challenge is clearly outside the purview of § 1252(g) and we may therefore consider the claim. *See Zhislin*, 195 F.3d at 814; *Carrera-Valdez v. Perryman*, 211 F.3d 1046, 1047 (7th Cir. 2000) (upholding district court's jurisdiction over Mariel Cuban's petition for release from indefinite detention); *Ho v. Greene*, 204 F.3d 1045, 1051 (10th Cir. 2000); *Ma v. Reno*, 208 F.3d 815, 818 n.3 (9th Cir. 2000), *cert. granted*, 121 S. Ct. 297 (Oct. 10, 2000); *Chi Thon Ngo v. INS*, 192 F.3d 390, 393 (3d Cir. 1999); *Zadvydas v. Underdown*, 185 F.3d 279, 285-86 (5th Cir. 1999), *cert. granted*, 121 S. Ct. 297 (Oct. 10, 2000).

### III. Mootness

After this appeal was submitted to this panel, the government informed the panel that on July 19, 2000, the INS determined that Rosales is releasable under the custody review procedures of 8 C.F.R. § 212.12. In its Notice of Releasability, the INS conditioned Rosales's release on efforts to find him a suitable sponsorship or placement, namely a halfway house, as required by the Cuban Review Plan at 8 C.F.R. § 212.12(f) ("No detainee may be released on parole until suitable sponsorship or placement has been found for the detainee."). The Notice further stated that Rosales's release

from custody is conditioned on his maintaining proper behavior while sponsorship and placement efforts are undertaken and that "[f]ailure to maintain good behavior could result in [] continued detention." Because the INS has not provided any further information indicating that such a sponsorship or placement has been found or that Rosales has been released on parole, we must assume that he is still in custody at the Federal Medical Center in Lexington, Kentucky.

The government argues that *Picrin-Peron v. Rison*, 930 F.2d 773, 776 (9th Cir. 1991), stands for the proposition that the INS's notice of releasability moots Rosales's appeal. In *Picrin-Peron*, the Ninth Circuit considered a detainee's appeal from the denial of his habeas corpus petition after the detainee had been released on parole for one year. Pursuant to the court's request, an INS official authored an affidavit for the court declaring that "absent Picrin's reinvolvement with the criminal justice system, a change in the Cuban government enabling him to return to Cuba, or the willingness of a third country to accept him, he will be paroled for another year." *Picrin-Peron*, 930 F.2d at 776. Based on this sworn statement, the Ninth Circuit dismissed Picrin's petition as moot, concluding that the court could offer the detainee no further relief. *See id*.

According to Article III of the Constitution, this court only possesses jurisdiction over actual cases and controversies that will the affect the rights of the litigants. *See McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (*en banc*). A case is deemed moot if the relief sought would make no difference to the legal interests of the parties. *See id*. We are obligated to consider whether the "case or controversy" justiciability requirement has been met in this case because it must be satisfied at all stages of review, not just upon initiation of a legal action. *See id*. Rosales's petition seeks either release from custody or a hearing before the Cuban Review Panel with certain procedural protections that he believes were denied to him in error. As a preliminary step in our analysis, we note that Rosales appears to remain in

respect to the legislative determination that individuals such as Mezei were to be excluded and not released. *Id.* ("Whatever our individual estimate of [the policy mandating Mezei's exclusion and indefinite detention] and the fears on which it rests, respondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate.").

Although national security concerns may have prompted the Attorney General to exclude and to detain Mezei under legislation passed by Congress, the Supreme Court did not rely on national security concerns to support its determination that he lacked a substantive due process right to be free from indefinite detention.[11] Rather, the Supreme Court's constitutional analysis turned on the more fundamental fact that Mezei, an excludable alien, had no constitutional rights at all. *Id*. at 215 (reasoning that Mezei's continued exclusion on Ellis Island did not deprive him of any constitutional rights because he was "treated as if stopped at the border[,]" despite his physical presence in the United States). While Congress had provided for *resident* aliens to be released on bond pending deportation, the *Mezei* Court noted that no similar statutory authority existed for the release of *excludable* aliens. The Supreme Court also recognized that Congress's failure to provide for the release of individuals such as Mezei likely stemmed from fears associated with the Korean War. *Id*. at 216. Although it questioned that congressional policy "and the fears on which it rest[ed]," the Supreme Court upheld Mezei's indefinite detention because, as an excludable alien, *he had no constitutional rights* and his right to enter the

---

[11]In fact, as noted above, the Supreme Court appeared to question whether Mezei was even a true national security risk. *Mezei*, 345 U.S. at 216 ("Whatever our individual estimate of [the policy mandating Mezei's exclusion and indefinite detention] and the fears on which it rests, respondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate.").

resulting hardships to the alien and inconvenience to the carrier persuaded Congress to adopt a more generous course. By statute, it authorized, in cases such as this, aliens' temporary removal from ship to shore. But such temporary harborage, an act of legislative grace, bestows no additional rights. . . . And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border.

Thus we do not think that respondent's continued exclusion deprives him of any statutory or constitutional right. . . .

*Id.* at 215 (citations and footnotes omitted).

The majority reasons that *Mezei* is distinguishable because it was decided in the midst of the Korean War and it involved an individual whom the executive branch had classified as a national security threat. The majority suggests that the *Mezei* Court found no constitutional violation flowing from the alien's indefinite detention precisely because of the national security concerns at issue. Given that such "incomparable exigencies" do not exist in the present case, the majority reasons that *Mezei* is distinguishable.

Having reviewed *Mezei*, I cannot agree with the majority's reading of the opinion. In *Mezei*, the Supreme Court cited the Korean War and national security concerns as the impetus behind the Attorney General's decision to exclude an alien, pursuant to the Passport Act of 1918, which permitted the executive branch "to shut out aliens whose 'entry would be prejudicial to the interests of the United States.'" *Mezei*, 345 U.S. at 210; *see also id.* at 216 (characterizing the alien's continued detention as "[a]n exclusion proceeding grounded on danger to the national security"). "[T]imes being what they [were]," the Court also recognized that Congress had declined to authorize the release of excludable aliens such as Mezei. *Id.* at 216. The *Mezei* Court then noted that it lacked the authority to substitute its judgment for that of Congress with

federal custody, as his parole is conditioned on the INS's ability to find him a suitable halfway house as well as on his continued good behavior. We also note that, according to 8 C.F.R. § 212.12(e), "[t]he Associate Commissioner for Enforcement may, in his or her discretion, withdraw approval for parole of any detainee prior to release when, in his or her opinion, the conduct of the detainee, or any other circumstance, indicates that parole would no longer be appropriate." Should the INS decide, in its discretion, to withdraw his parole or should it be unable to find him a suitable placement, Rosales will therefore continue to be detained in federal custody. Thus, this case is not like *Picrin*, in which petitioner had already been released from detention and the INS verified in a sworn affidavit that he would continue to be granted yearly parole absent his involvement in any criminal activity. Moreover, if Rosales is not released, the same procedures that he asserts are constitutionally defective will continue to be used against him. Based on these circumstances, we conclude that Rosales's petition for relief is not rendered moot by virtue of the fact that he has been notified that he is releasable. This case clearly represents a substantial ongoing controversy between the parties, for which this court can offer relief.

Moreover, we believe that, should Rosales be physically released, this case may also be adjudicated under the well-established exception to the mootness doctrine for controversies capable of repetition yet evading review. *See Grider v. Abramson*, 180 F.3d 739, 746 (6th Cir. 1999); *Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675, 677 (6th Cir. 1994); *aff'd*, 515 U.S. 753 (1995). Two criteria must be satisfied for a claim to fall under this exception to the mootness doctrine. First, the complaining party must show that the duration of the dispute is too short to be litigated fully prior to the cessation or expiration of the action. Second, the complaining party must show that there is a reasonable expectation that it will be subjected to the same action again. *See Suster v. Marshall*, 149 F.3d 523, 527 (6th Cir. 1998). The Cuban Review Plan confers on the Cuban Review Panel and the Associate Commissioner for

Enforcement substantial discretion to withdraw parole approval prior to release and to revoke a detainee's parole once he is out of custody. *See* 8 C.F.R. § 212.12(e), (h).[15] While the Plan provides yearly review for detainees who have been refused parole, *see id.* at § 212.12 (g)(2), the Cuban Review Plan Director may schedule a review of the detainee's status "at any time when the Director deems such a review to be warranted." *See id.* at § 212.12 (g)(3). Due to the discretionary nature of these regulations, the Associate Commissioner for Enforcement or the Cuban Review Panel may grant parole, withdraw parole approval or revoke Rosales's parole repeatedly within a time period too short to effect appellate review of a habeas corpus petition. We have every reason to believe that future review of another habeas petition filed by Rosales will take at least as long as the instant case in arriving at this court. Moreover, should the INS and its officials engage in repeated denials, revocations or withdrawals of parole, the regulations make clear that Rosales will face the same detention and hearing procedures that he challenges in his current petition. Because Rosales's situation is capable of repetition yet evading review, we conclude that his appeal is not moot.

### IV.  Standard of Review

This court reviews a district court's dismissal of a habeas corpus petition *de novo*. *See Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998).

---

[15]The Associate Commissioner may revoke parole in the exercise of her discretion when "(1) The purposes of parole have been served; (2) The Mariel Cuban violates any condition of parole; (3) It is appropriate to enforce an order of exclusion or to commence proceedings against a Mariel Cuban; or (4) The period of parole has expired without being renewed." 8 C.F.R. § 212.12(h).

1446 (11th Cir.1986). *See also Chi Thon Ngo v. INS*, 192 F.3d 390 (3d Cir. 1999). The only arguably contrary decision, *Rodriguez- Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981), has not garnered adherents and is of doubtful vitality in its own circuit. *Duy Dac Ho v. Greene*, 204 F.3d 1045 (10th Cir.2000). Given *Shaughnessy* there is little point in elaborate discussion by an inferior court. Carrera is not constitutionally entitled to release.

*Id.* at 1048.[9]

In finding that excludable aliens have no constitutional right to be free from indefinite immigration detention, the federal courts have relied largely upon *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), in which the Supreme Court held that an excludable alien may be detained indefinitely, without violating the Constitution, when his country of origin will not accept his return.[10] In *Mezei*, the Court reasoned as follows:

> . . . Aliens seeking entry from contiguous lands obviously can be turned back at the border without more. While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility,

---

[9]The majority cites *Carrera-Valdez* and *Gisbert* for the proposition that the Attorney General has the *statutory* authority to detain an excludable alien indefinitely, while failing to acknowledge that those cases also stand for the proposition that an excludable alien has no *constitutional* right to be free from indefinite detention.

[10]Although the alien in *Mezei* had lived in the United States for approximately 25 years, he left this country in 1948, without authorization or reentry papers, and resided in Hungary for 19 months. *Mezei*, 345 U.S. at 208, 214. In light of those facts, the Supreme Court had "no difficulty in holding respondent an entrant alien or 'assimilated to [that] status' for constitutional purposes." *Id.* at 214 (quoting *Kwong Hai Chew v. Colding*, 344 U.S. 590, 599 (1953)).

and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 79-80. Indeed, "[c]ourts have long recognized that the governmental power to exclude or expel aliens may restrict aliens' constitutional rights when the two come into direct conflict." *Zadvydas*, 185 F.3d at 289.

Consistent with the foregoing principles, the federal circuit courts routinely have rejected constitutional arguments that are similar, if not identical, to the one advanced by Rosales in the present case. Most recently, the Seventh Circuit rejected a substantive due process challenge to indefinite confinement in *Carrera-Valdez v. Perryman*, 211 F.3d 1046 (7th Cir. 2000),[8] reasoning as follows:

> Almost fifty years ago, the Supreme Court held that an excludable alien may be detained indefinitely when his country of origin will not accept his return. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Several Justices in more recent years have expressed unease with that decision, but it is conclusive in the courts of appeals. It is therefore not surprising that at least five appellate courts have rejected constitutional challenges, similar to Carrera's, brought by others who arrived on the Mariel boatlift. *See Guzman v. Tippy*, 130 F.3d 64 (2d Cir.1997); *Palma v. Verdeyen*, 676 F.2d 100 (4th Cir.1982); *Gisbert v. Attorney General*, 988 F.2d 1437, *amended*, 997 F.2d 1122 (5th Cir.1993); *Barrera- Echavarria v. Rison*, 44 F.3d 1441 (9th Cir.1995) (*en banc*); *Garcia-Mir v. Meese*, 788 F.2d

---

[8] The facts of *Carrera-Valdez* are similar to those of the present case. The petitioner in *Carrera-Valdez* was a Mariel Cuban who was declared excludable following his arrival in this country. Like Rosales, the petitioner in *Carrera-Valdez* was released several times on immigration parole only to be taken into custody after committing crimes here. He sought a writ of habeas corpus ordering his release until he could be returned to Cuba. *Carrera-Valdez*, 211 F.3d at 1047.

## V. Analysis

This circuit has not ruled definitely on the constitutionality of indefinite detention of excludable aliens.[16] In its brief to this court, the government frames the question before us as whether Rosales has a protected statutory or constitutional entitlement to immigration parole. The larger question, however, is whether the executive branch of the government has the authority under the United States Constitution to detain a person indefinitely without charging him with a crime or affording him a trial. We hold that indefinite detention of Mario Rosales-Garcia cannot be justified by reference to the government's plenary power over immigration matters and that it violates Rosales's substantive due process rights under the Due Process Clause of the Fifth Amendment to the Constitution.

### A. Statutory Authority to Detain Indefinitely

Our first point of analysis is Rosales's statutory claim that the Attorney General and the INS violated their governing statutes and regulations by denying him parole and detaining him indefinitely. *See Reno v. Flores*, 507 U.S. 292, 300 (1993) (noting reviewing court's obligation to construe statutes to avoid constitutional problems unless such construction is plainly contrary to Congress's intent). The government argues that we are bound by former 8 U.S.C. § 1226(e) (1994), which, according to the government,

---

[16] This court has authored several unpublished decisions including *Betancourt v. Chandler*, No. 99-5797, 2000 WL 1359634, at *2 (6th Cir. Sept. 14, 2000) (rejecting claim that Attorney General lacks authority to detain excludable alien indefinitely); *Laetividad v. INS*, No. 99-5245, 1999 WL 1282432, at * 1 (6th Cir. Dec. 27, 1999); *Fernandez-Santana v. Chandler*, No. 98-6453, 1999 WL 1281781, at *1 (6th Cir. Dec. 27, 1999); and *Gonzalez v. Luttrell,* No. 96-5098, 1996 WL 627717, at *1 (6th Cir. Oct. 29, 1996), that affirm the district court's dismissal or denial of an excludable alien's habeas corpus petition. However, because these cases are unpublished, they are not binding on this court. *See* 6th Cir. R. 28(g); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 833 (6th Cir. 2000) (unpublished decisions are not binding precedent).

authorizes the Attorney General to continue to detain Rosales indefinitely. According to IIRIRA, its permanent provisions apply only to removal proceedings commenced after April 1, 1997, IIRIRA's effective date. *See* IIRIRA § 309(c)(1). We agree with the government that we must apply former § 1226(e) to the instant case because Rosales was declared excludable in 1987 and his immigration parole was last revoked on March 24, 1997, prior to the Act's effective date.[17] *Cf. INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (counseling that courts of appeals must apply *Chevron* deference to agency's interpretations of immigration statute).

According to former § 1226(e), pending a determination of excludability, the Attorney General must take into custody any alien convicted of an aggravated felony[18] upon release of the alien. *See* § 1226(e)(1) (1994); *see also* 8 U.S.C. § 1182(d)(5)(A) (1994) (giving the Attorney General the right to return into custody an excludable alien when "the purposes of such parole shall . . . have been served"); § 1227(a) (1994) (authorizing Attorney General immediately to deport any alien who is excludable unless she decides, in her discretion, "that immediate deportation is not practicable or proper"). Under the former statute, the Attorney General may not release the alien from custody unless she determines that the alien may not be deported because the alien's home country denies or unduly delays acceptance of the alien's return. *See* § 1226(e)(2) (incorporating 8 U.S.C. § 1253(g) (1994)). If this determination is made, the Attorney General may release the alien only after a review in which the severity of the felony committed by the alien is considered and the review concludes that the alien will not pose a danger to the safety of other persons or to property. *See* § 1226(e)(3). Many circuits, including the Second, Third, Fifth, Seventh, Ninth, and Tenth Circuits have found former § 1226(e) to authorize

---

[17] 8 U.S.C. § 1226 (1994) was repealed and reenacted by Congress in IIRIRA § 303 (codified at 8 U.S.C. § 1226). The amended version of the statute is inapplicable to this case.

[18] *See* 8 U.S.C. § 1101(a)(43) (1994) (defining aggravated felonies).

the admissions process. As such, its denial or revocation does not rise to the level of a constitutional infringement. Because the Cubans lack a constitutional liberty interest, we need not reach the question of whether the Attorney General's plan satisfies due process."); *Ma*, 208 F.3d at 824 (quoting *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir. 1995)) (citations omitted) ("Noncitizens who are outside United States territories enjoy very limited protections under the United States Constitution. Because excludable aliens are deemed under the entry doctrine not to be present on United States territory, a holding that they have no substantive right to be free from immigration detention reasonably follows.").

While it would indeed shock the conscience to permit the INS to shoot or to torture a person seeking entry into the United States, it is not conscience shocking to allow the INS to enforce its immigration policies by indefinitely detaining such a person at the border when he will not or cannot go elsewhere.[7] The Supreme Court has long held that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). "In the exercise of its broad power over naturalization

---

[7] As noted, *supra*, the majority does not question the applicability of the "entry fiction," which treats Rosales as if he is being detained at the border, despite his physical presence in the United States. Although the entry fiction may appear to be draconian in operation, it has a humanitarian purpose. The entry fiction is a compassionate response to the hardships that surely would have befallen Rosales if INS representatives had prevented him and other Mariel Cubans from bringing their boats ashore, as the government unquestionably had the right to do. In other words, the United States lawfully could have forced Rosales and the other Mariel Cubans to remain at sea, where they almost certainly would have died from drowning, dehydration or starvation. Instead, the government allowed Rosales and the others to come ashore, under the entry fiction, which treats the Mariel Cubans as if they are still at sea, and outside of U.S. territory, for immigration purposes.

clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials.

*Id.* at 1373-1374 (footnotes omitted); *see also Gisbert*, 988 F.2d at1442 ("*Lynch* plainly recognizes that excludable aliens may legally be denied other due process rights, *including* the right to be free of detention.").[5]

In the present case, the government is not endeavoring to deprive Rosales of life or property, nor is it seeking to deprive him of liberty, except to the extent necessary to exclude him from this country, which the majority concedes the INS has an absolute right to do. It is in *this* context that Rosales has no liberty interest protected by the Fifth Amendment.[6] *See Fernandez-Roque*, 734 F.2d at 582 (footnote omitted) ("[W]e are compelled to conclude that [immigration] parole is part of

---

[5] In *Gisbert*, the Fifth Circuit expressly rejected the position taken by the majority herein that the indefinite detention of Mariel Cubans constitutes punishment without a trial in violation of their substantive due process rights. *Gisbert*, 988 F.2d at 1441-1442.

[6] When engaging in a substantive due process analysis, a court must begin with "a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). In the present case, Rosales does not dispute the Attorney General's power to exclude him or to detain him for a reasonable time to effect his return to Cuba. Rather, he claims that, because Cuba refuses to accept him, his detention is indefinite, and possibly permanent, thus constituting punishment without a trial. Rosales contends, and the majority agrees, that he has a liberty interest in being free from this type of detention. If his habeas petition is granted, however, he will be awarded the very right that the government lawfully denied to him as a result of his exclusion, namely the right to be at large in the United States. Although Rosales characterizes his request as one to be released from incarceration, the relief that he seeks is indistinguishable from a request to be admitted into this country until his return to Cuba can be arranged. As set forth more fully, *supra*, Rosales has no constitutional right to be released into this country, and the government has an absolute right to ensure his exclusion.

---

the Attorney General to detain indefinitely an excludable alien who has been convicted of an aggravated offense. *See Ho v. Greene*, 204 F.3d 1045, 1055 (10th Cir. 2000) (Attorney General has authority to continue indefinitely to detain excludable alien whose deportation cannot be accomplished expeditiously because the "statute is framed not as a grant of authority to detain the alien, but as a limitation on the Attorney General's power to release the alien from detention"); *Carrera-Valdez v. Perryman,* 211 F.3d 1046, 1048 (7th Cir. 2000); *Chi Thon Ngo v. INS*, 192 F.3d 390, 394 (3d Cir. 1999) (statute permits prolonged detention of excludable aggravated felons); *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1446 (5th Cir. 1993) ("[W]e do not regard section 1226(e) as a limitation on the Attorney General's authority to detain excludable aliens, either before or after final determination of excludability, pending their removal from this country."); *Alvarez-Mendez v. Stock*, 941 F.2d 956, 962 (9th Cir. 1991) ("The only logical interpretation of section 1226(e) is that it . . . provides that where deportation of an alien found excludable cannot be immediate, the Attorney General may release [the alien] only if doing so will not endanger society.").

Former § 1226(e) is not ambiguous concerning the Attorney General's discretion to detain indefinitely an excludable alien whose deportation cannot be expeditiously accomplished. The statute explicitly states that the Attorney General "shall" not release an alien from custody unless she determines that the alien will not pose a danger to the safety of other persons or to property. The statute does not contain any language limiting the length of time the Attorney General may detain an alien pending a determination that the alien no longer poses a threat to society. Nor does the statute carve an exception to this language for aliens whose home countries refuse to accept their return. We therefore conclude, in accordance with the other circuits that have analyzed this issue, that the statute clearly authorizes the Attorney General to detain an excludable alien indefinitely. Because we cannot construe the statute to avoid constitutional inquiry, we must now address the constitutionality of Rosales's detention.

## B. The Immigration Statute and the Plenary Power Doctrine

In this case, we are confronted with two principles deeply embedded in our jurisprudence that conflict with each other: the political branches' almost complete authority over immigration matters and a person's inalienable right to liberty absent charges or conviction of a crime. Rosales's petition for habeas corpus relief does not contest the government's almost complete control over matters of immigration policy. Under Art. I, § 8, cl. 4 of the Constitution[19] and the plenary power doctrine,[20] the executive and legislative branches have coordinate authority to establish and enforce policies for admission to and exclusion from this country, while the judiciary accords those branches almost total deference. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (authority over immigration matters stems not just from legislative power "but is inherent in the executive power to control the foreign affairs of the nation."); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893) (it is the "right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and

---

[19]The Constitution imbues the legislature with the power to "establish an uniform Rule of Naturalization." U.S. CONST. Art. I, § 8, cl. 4.

[20]The plenary power doctrine, articulated in *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952), states that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *See also Zadvydas*, 185 F.3d at 289 ("The power of the national government to act in the immigration sphere is thus essentially plenary.").

295 (5th Cir. 1999), *cert. granted*, 121 S.Ct. 297 (Oct. 10, 2000) (recognizing that excludable aliens may have substantive due process rights, but only with respect to matters that are unrelated to the government's plenary power over immigration). However, this principle does not "limit the government's conduct in the immigration field where it possesses plenary authority." *Fernandez-Roque*, 734 F.2d at 582 n.8 (citing *Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (*en banc*), *aff'd* 472 U.S. 846 (1985)). In *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987), the court articulated a clear rationale for drawing "a line of constitutional dimension" between torturing an excludable alien and detaining him indefinitely:

> The basis for limiting the constitutional protection afforded excludable aliens has been the overriding concern that the United States, as a sovereign, maintain[s] its right to self-determination. "As the history of its immigration policy makes clear, this nation has long maintained as a fundamental aspect of its right to self-determination the prerogative to determine whether, and in what numbers, outsiders without any cognizable connection to this society shall be permitted to join it." Courts ordinarily should abstain from placing limits on government discretion in these circumstances because the sovereign interest in self-determination weighs so much more heavily in this scheme than does the alien's interest in entering the country. That interest, however, plays virtually no role in determining whether the Constitution affords any protection to excludable aliens while they are being detained by state officials and awaiting deportation. Counsel has not suggested and we cannot conceive of any national interests that would justify the malicious infliction of cruel treatment on a person in United States territory simply because that person is an excludable alien. We therefore hold that, whatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process

is regulatory in nature rather than punitive, and it does not violate substantive due process, even if a protected liberty interest is at stake.

Concerning the first issue, the existence of a liberty interest, I do not dispute that excludable aliens possess *some* Fifth Amendment rights. It is true that neither the Attorney General nor the INS may shoot or torture Rosales without running afoul of his substantive due process rights. *See*, *e.g.*, *Gisbert v. U.S. Attorney General*, 988 F.2d 1437, 1442 (5th Cir.1993), *amended* 997 F.2d 1122 (5th Cir.1993) (recognizing that excludable aliens have a substantive due process right to be free from "gross physical abuse"). The majority's ruling turns upon its inability to "draw a line of constitutional dimension between the act of torturing an excludable alien and the act of imprisoning such an alien indefinitely." The court concludes that the Constitution does not authorize the judiciary "to draw such a line."

Upon review, however, I cannot agree that drawing a line between torturing an excludable alien and indefinitely detaining him to ensure exclusion from this country violates the Constitution. The government's indefinite detention of an excludable alien simply is not equivalent, for Fifth Amendment purposes, to torturing him or to killing him. It has been generally accepted that "[e]xcluded aliens may be able to challenge, under a constitutional theory, governmental action *outside of the immigration context*."[4] *Fernandez-Roque v. Smith*, 734 F.2d 576, 582 n.8 (11th Cir. 1984) (emphasis added) (citing *United States v. Henry*, 604 F.2d 908, 914 (5th Cir. 1979)); *see also Zadvydas v. Underdown*, 185 F.3d 279,

---

[4] *But see Ma*, 208 F.3d at 824 (stating that "it is 'not settled' that excludable aliens have any constitutional rights at all"); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) ("'The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.'")).

independent nation, essential to its safety, its independence, and its welfare . . . ."). Under this doctrine, the Attorney General is charged with the administration and enforcement of all laws relating to the immigration and naturalization of aliens, and she does so with virtually no interference from the courts.[21] The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953); *see also Diaz*, 426 U.S. at 82 (noting "narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization").

Nor does Rosales contest the government's right to designate him an excludable alien and attempt to remove him from this country. The principle that there is no constitutional right to enter this country, *see Knauff*, 338 U.S. at 542, is not under review in this case. The Supreme Court has made clear that an attempt to enter this country is considered a request for a privilege rather than an assertion of right, because "the power to admit or exclude aliens is a sovereign prerogative." *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982). According to the Supreme Court, such a privilege can only be exercised according to the procedures established by Congress and implemented by the appropriate executive officials. *See Knauff*, 338 U.S. at 542-44.

Finally, Rosales does not challenge the government's application of the "entry fiction" to his case. Under the former version of the immigration act the government had two mechanisms for returning non-citizens to their country of origin: "exclusion" was the procedure used to refuse an alien

---

[21] *See* 8 U.S.C. §§ 1103, 1182. Section 1103(a)(1) states that the "Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens" and that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling."

entry at the border of this country; "deportation" was the procedure used to remove an alien who has already entered the country but is here illegally. *See Plasencia*, 459 U.S. at 25-26. Although exclusion proceedings usually occurred at the port of entry, the Supreme Court developed what has become known as the "entry fiction" to govern the rights of those aliens who are deemed excludable but who have nonetheless been allowed to enter physically the United States for humanitarian, administrative, or other reasons, under 8 U.S.C. § 1182(d)(5)(A). Under the entry fiction, an alien deemed to have entered this country illegally is treated as if detained or "excluded" at the border despite his physical presence in the United States. *See Gisbert*, 988 F.2d at 1440 (explaining distinction between excludable and deportable aliens). Excludable aliens have no rights with regard to their entry or exclusion from this country and they are treated differently from those who have "passed through our gates." *Mezei*, 345 U.S. at 212; *but see Plasencia*, 459 U.S. at 32-34 (resident alien detained at border upon return to country is validly subject to exclusion proceeding but may invoke procedural due process protections during proceedings); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 597-600 (1953) (resident alien returning to U.S. after five-month absence is subject to exclusion hearing but is entitled to procedural due process protections). According to the Supreme Court, they are due only the procedures authorized by Congress for their removal proceedings and nothing more. *See Mezei*, 345 U.S. at 212 (citing *Knauff*, 338 U.S. at 544); *compare Zadvydas*, 185 F.3d at 295-97 (extending entry fiction to deportable aliens who have received final order of deportation and stripping them of due process right to be free from indefinite detention) *and Ho*, 204 F.3d at 1059-60 (same) *with Ma*, 208 F.3d at 825-26 n. 23 (rejecting INS's argument that aliens ordered deportable are on same constitutional footing as excludable aliens seeking entry).

Rosales does, however, challenge the government's authority to detain him indefinitely after he has completed his federal prison sentence and has neither been charged with nor

excludable aliens by detaining them indefinitely,[3] the punitive/regulatory distinction itself turns on (1) whether the detention is rationally related to some alternative (*i.e.*, non-punitive) purpose, and (2) whether the detention appears excessive in relation to the alternative purpose that Congress sought to achieve. *Id.* at 747.

Applying the foregoing test, the majority notes that the United States has identified as its "alternative purpose" in detaining Rosales "the need to protect society from a person who poses a danger to the safety of other persons or to property . . . ." The court then recognizes that Rosales's detention *is* "rationally related" to the government's "alternative" purpose of public safety. Nevertheless, the majority concludes that his indefinite detention is "excessive" in relation to the government's alternative (*i.e.*, non-punitive) purpose, given (1) the probability that he never will return to Cuba and (2) the fact that he "can never be certain of receiving [immigration] parole, no matter how well he behaves himself in detention." As a result, the court concludes that his "detention has crossed the line from permissive regulatory confinement to impermissible punishment without trial . . . ." Consequently, the majority orders his immediate release.

Having reviewed the majority's analysis, I disagree with it in two primary respects. *First*, I do not believe that the indefinite detention of an excludable alien such as Rosales implicates any protected liberty interest in freedom from bodily restraint. *Second*, even assuming, arguendo, that a Fifth Amendment liberty interest is implicated, I do not believe that Rosales's detention, which includes annual review for parole eligibility, is excessive in relation to the government's non-punitive purpose. Consequently, under *Salerno*, his detention

---

[3]The majority finds no evidence that Congress intended to punish Rosales and other excludable aliens by detaining them indefinitely. I agree with this aspect of the majority's reasoning.

In so doing, the court properly notes that even excludable aliens are not completely without constitutional protection. Given that aliens have been extended certain Fifth, Sixth and Fourteenth Amendment rights, the majority concludes that *excludable* aliens such as Rosales possess a Fifth Amendment liberty interest in freedom from indefinite detention by the INS. After also recognizing that Congress may not authorize immigration officials to treat excludable aliens with "complete impunity" by executing or torturing them, the majority reasons:

> . . . We therefore find ourselves asked to draw a line of constitutional dimension between the act of torturing an excludable alien and the act of imprisoning such an alien indefinitely. We do not believe that the Constitution authorizes us to draw such a line. While it is true that aliens are not entitled to enjoy all the advantages of citizenship, *see Diaz*, 426 U.S. at 78, we emphasize that aliens—even excludable aliens—are "persons" entitled to the Constitution's most basic protections and strictures. We conclude that if Rosales is indeed being detained indefinitely, [as] discussed *infra*, his Fifth Amendment interest in liberty is necessarily implicated.

After finding that excludable aliens possess a liberty interest in freedom from indefinite bodily restraint, the majority concludes that Rosales's continued detention violates substantive due process. In reaching this conclusion, the majority relies upon the analytical framework set forth in *United States v. Salerno*, 481 U.S. 739 (1987). In *Salerno*, the Supreme Court explained that whether a restriction on liberty (in the form of pretrial detention) violates substantive due process turns upon whether the detention is *punishment* without a trial or whether it is *regulatory* in nature. *Id.* at 746-747. Absent evidence that Congress intended to punish

convicted of another crime. It is to this challenge that we now turn our attention.

## C. Constitutional Authority to Detain Indefinitely

The Fifth Amendment to the Constitution restricts the government from depriving all persons of the right to life, liberty, or property without due process of law. *See* U.S. CONST. amend. V. The Supreme Court has consistently held that aliens physically present in this country are not wholly without constitutional protection. Indeed, the Supreme Court has accorded aliens a panoply of Fifth, Sixth, and Fourteenth Amendment rights. Should an excludable alien be accused of committing a crime, he would be entitled to the constitutional protections of the Fifth and Sixth Amendments. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[I]t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by [the fifth and sixth] amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."). Thus, in *Wong Wing v. United States*, the Court struck down a federal statute imposing a maximum of one year of hard labor on a Chinese alien upon a determination of his deportability, finding it a violation of the alien's due process right to be free from punishment without trial. In *Yick Wo v. Hopkins*, another early immigration case, the Supreme Court announced that the Fourteenth Amendment's protections extend to aliens as well:

> The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: "Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and

the equal protection of the laws is a pledge of the protection of equal laws.

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (finding imprisonment of Chinese immigrants under state statute unconstitutional because it violated Equal Protection Clause of Fourteenth Amendment); *see also Flores*, 507 U.S. at 315-16 (O'Connor, J., concurring) (emphasizing that juvenile aliens have a constitutionally protected liberty interest, rooted in the Due Process Clause, in freedom from institutional confinement); *Diaz*, 426 U.S. at 77 (noting that there are millions of aliens in this country and that "[t]he Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these [aliens] from deprivation of life, liberty, or property without due process of law" whether they are here unlawfully or not).

As the Supreme Court has evaluated whether to extend entitlements or rights to aliens in addition to those protected by the Fifth, Sixth, and Fourteenth Amendments, the Court has demonstrated a willingness to draw lines between the rights due to citizens and those due to aliens. *See Diaz*, 426 U.S. at 80 (noting that "Congress regularly makes rules that would be unacceptable if applied to citizens"). The Court has also expressed its willingness to distinguish among different classifications of aliens. However, it has never held that aliens are utterly beyond the purview of the Constitution. Thus, in *Diaz*, the Court held that Congress may constitutionally condition an alien's receipt of federal medical insurance benefits (Medicare Part B) on the legality of his entry and the length of his residence in this country. *See Diaz*, 426 U.S. at 82-83. However, in *Graham v. Richardson*, 403 U.S. 365, 374 (1971), the Court held that state statutes conditioning welfare benefits on a residency requirement or denying welfare benefits to resident aliens violated the Fourteenth Amendment's Equal Protection Clause. The Supreme Court has also determined that the exclusion of the children of illegal aliens from a public school system pursuant to a state statute violated the Equal Protection Clause of the Fourteenth Amendment. Rejecting the government's

branches of the government have almost complete control over matters involving immigration and the exclusion of aliens, with virtually no interference from the judiciary. *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953). *Second*, the government has the right to designate Rosales an excludable alien and to attempt to remove him. Rosales has no constitutional right to enter this country, and any attempt to do so is a request for a privilege. This privilege must be exercised in accordance with procedures established by Congress and implemented by the executive branch. *See, e.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-544 (1950). *Third*, the "entry fiction" applies to this case. The entry fiction treats an excludable alien "as one standing on the threshold of entry, and therefore not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States." *Ma v. Reno*, 208 F.3d 815, 823 (9th Cir.), *cert. granted*, 121 S.Ct. 297 (Oct. 10, 2000). The majority acknowledges that, under the entry fiction, individuals such as Rosales are "treated as detained or 'excluded' at the border despite [their] physical presence in the United States." Indeed, the majority notes that such individuals "have no rights with regard to their entry or exclusion from this country and they are treated differently from those who have 'passed through our gates.'"

After recognizing the foregoing principles, the majority examines the "constitutional authority to detain indefinitely."[2]

---

[2]Before examining the constitutional issue, the majority resolves several other issues. *First*, the majority concludes that the district court possessed jurisdiction to hear Rosales's claim and that this court has jurisdiction to hear his appeal. *Second*, the majority finds that Rosales's appeal has not been rendered moot by virtue of the INS issuing a Notice of Releasability. *Third*, the majority concludes that the Attorney General and the INS *do* possess the *statutory* authority to detain Rosales indefinitely. I agree with each of these conclusions for the reasons set forth by the majority.

————————————

## DISSENT

————————————

WALTER HERBERT RICE, District Judge, dissenting. Petitioner Mario Rosales-Garcia ("Rosales"), a citizen of Cuba, is an excludable alien who came to the United States as part of the Mariel boatlift. Since his arrival, Rosales twice has been granted immigration parole by the Immigration and Naturalization Service ("INS").[1] On each occasion, the INS revoked his parole after his conviction on various criminal charges. He is now being detained by the INS, pending an agency determination either (1) that he is eligible for immigration parole once again or (2) that Cuba will accept his return. The majority frames the issue before the court as "whether the executive branch of the government has the authority under the United States Constitution to detain a person indefinitely without charging him with a crime or affording him a trial." With respect to Rosales, the majority answers this question in the negative, concluding that his indefinite detention "cannot be justified by reference to the government's plenary power over immigration matters and that it violates [his] substantive due process rights under the Due Process Clause of the Fifth Amendment to the Constitution."

In reaching the foregoing conclusion, the majority does not dispute three key points. *First*, the executive and legislative

———————————————

[1] Immigration parole adopts the fiction that Rosales has never entered this country. *See Vargas v. Swan*, 854 F.2d 1028, 1029 (7th Cir.1988). Despite his parole and physical presence within the United States, the INS treats Rosales as though he has not been admitted into this country, and, legally, he remains at "the threshold of initial entry." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). Therefore, he "stands on a different footing" than an alien who has already passed through this nation's gates. *Id.*

argument that illegal aliens are not "persons" within the purview of the Constitution, the Court stated that "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

The government, relying on the Supreme Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), asks this court to conclude, despite a long line of Supreme Court decisions extending to aliens basic Fifth, Sixth, and Fourteenth Amendment protections, that excludable aliens have no cognizable Fifth Amendment liberty interest under the Constitution in freedom from indefinite incarceration. In *Mezei*, the Supreme Court reviewed the case of an excludable alien who was being detained indefinitely on Ellis Island because this country deemed him a security threat and the alien's home country, as well as other nations, refused to allow him to return.[22] When the case reached the Supreme Court in 1953, Mezei had been detained on Ellis Island for close to two years. Addressing the question whether the potentially indefinite detention of an excludable alien without a hearing violated the Constitution, the Supreme Court observed that "[c]ourts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Mezei*, 345 U.S. at 210. The Court then deferred to the executive's authority to "impose additional

———————————————

[22] Mezei was born in Gibraltar and lived in the United States from 1923 to 1948. *See Mezei*, 345 U.S. at 208. In 1948, he went to Romania to visit his dying mother. He was denied entry to Romania, and remained in Hungary for 19 months before returning to the United States with a quota immigration visa issued by this country. On February 9, 1950 he was deemed excludable by an immigration officer at Ellis Island on the ground that his entry would prejudice the public interest because he was a security threat.

restrictions on aliens entering or leaving the United States during periods of international tension and strife." *Id.* Noting the existence of a presidentially-declared state of emergency, the Supreme Court found that the Attorney General's authority to act derived from the Passport Act of 1918, which permitted the executive to "shut out aliens whose 'entry would be prejudicial to the interest of the United States'" during periods of national emergency.[23] *Id.* at 210-11 (citing regulations at 8 C.F.R. § 175.53 promulgated in accordance with the amendments to the Passport Act). The Supreme Court decided that "the times being what they are" it would not question the Attorney General's discretion to detain Mezei at Ellis Island in deference to his assessment that Mezei presented a security threat. *Id.* at 216. Deeming this case "[a]n exclusion proceeding grounded on danger to the national security," *id.*, the Court refused to substitute its judgment for the legislative will. Thus, it found no statutory or constitutional impediment to Mezei's detention or denial of a hearing. *See id.* at 215.

The government would have this court accept the premise that the entry fiction completely forecloses any need for this court to examine whether an excludable alien, faced with the prospect of indefinite detention imposed by an executive agency, possesses a Fifth Amendment interest in liberty from physical constraint. We do not disagree that the entry fiction is an important doctrinal principle that the Supreme Court has employed to uphold this country's immigration laws and regulations, most notably our sovereign right to determine who may enter our borders, and our concomitant policy not to let other nations determine whom we must accept or reject by

---

[23]The Passport Act was amended in 1941 by an act of Congress pursuant to a national emergency declared by the President on May 27, 1941 and which continued in effect in 1953. The amendments to the Act gave the Attorney General authority to exclude aliens whose "entry would be prejudicial to the United States." *See Knauff*, 338 U.S. at 540-41 (citing Act of June 21, 1941, c. 210, 55 Stat. 252, amending § 1 of the Act of May 22, 1918, c. 81, 40 Stat. 559, codified at 22 U.S.C. § 223 (repealed 1952)).

## VI. Conclusion

The district court held that the prospect of indefinitely detaining Rosales was not "arbitrary, conscience-shocking nor oppressive in the constitutional sense." With all due respect, this court must disagree. We conclude that the district court improperly denied Rosales's petition for habeas corpus. We therefore **REVERSE** the district court's judgment and **REMAND** for proceedings in accordance with this opinion.

immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (internal citation omitted). Such deference becomes less compelling, however, when it directly conflicts with other constitutional interests. *Cf. INS v. Chadha*, 462 U.S. 919, 941 (1983) ("Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction.") (internal citation omitted). When there is no practical possibility that the alien will be returned home, as in this case, then Rosales's prolonged detention can no longer be considered an ancillary administrative element of the INS's removal procedures and judicial deference loses its rationale altogether. We agree with the Tenth Circuit that when an alien's home country refuses to accept him, it appears that "detention is [] used as an alternative to exclusion rather than a step in the process of returning petitioner to his native Cuba."[33] *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1386 (10th Cir. 1981); *cf. Chi Thon Ngo*, 192 F.3d at 398 ("It is [] unrealistic to believe that these INS detainees are not actually being 'punished' in some sense for their past conduct."). We conclude, therefore, that Rosales's detention has crossed the line from permissive regulatory confinement to impermissible punishment without trial.[34] We order Rosales's release within thirty days of the issuance of the mandate, following a hearing before the district court, upon such conditions as the district court may impose consistent with this opinion.

---

[33]Although the dissent claims that our reasoning will undermine this nation's ability to enforce its immigration laws by encouraging foreign countries to send their undesirable citizens to our shores, *see infra* p. 57, we believe the dissent's contention is belied by common sense. By virtue of the fact that a nation has cast out certain of its citizens — as in the Mariel boatlift — we can reasonably conclude that such a nation is unlikely to be influenced by the possibility that one day its citizens might be paroled into this country, rather than spending their remaining days locked up in American detention centers.

[34]Because we find that petitioner's substantive due process rights were violated, we do not reach his procedural due process claims.

virtue of their refusal to repatriate their own citizens. However, crucial to our understanding and application of the *Mezei* decision are the circumstances in which the case was decided: the opinion was authored in the midst of the Korean War, as our nation labored under a fear of Communist infiltration[24] and in a state of affairs defined as a national emergency.[25] Courts have always allowed the executive an extraordinary amount of leniency during wartime or when the national security is truly at stake.[26] Such incomparable

---

[24]The Supreme Court in *Mezei* specifically noted that Mezei's stateless condition was due to the fact that he "left the United States and remained behind the Iron Curtain for 19 months." *Mezei*, 345 U.S. at 214. In his dissent, Justice Jackson criticized the majority for succumbing to the government's fear of Communist "infiltration." He stated: "[M]y apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else." *Id.* at 227 (Jackson, J., dissenting). He concluded by observing that it is "inconceivable" that a "measure of simple justice and fair dealing," namely a "fair hearing with fair notice of the charges," would "menace the security of this country. No one can make me believe that we are that far gone." *Id.* at 228.

[25]Moreover, *Mezei* has been severely criticized for establishing a "preposterous" level of deference to Congress's authorization of due process procedures for aliens. *See Henry Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1392 (1953).

[26]Indeed, prior to those Supreme Court cases in the 1950s allowing indefinite detention, courts refused to permit the indefinite detention of aliens. As one court held:
> The right to arrest and hold or imprison an alien is nothing but a necessary incident of the right to exclude or deport. There is no power in this court or in any other tribunal in this country to hold indefinitely any sane citizen or alien in imprisonment, except as a punishment for crime. Slavery was abolished by the Thirteenth Amendment. It is elementary that deportation or exclusion proceedings are not punishment for crime. . . . [Petitioner] is entitled to be deported, or to have his freedom.

*Bonder v. Johnson*, 5 F.2d 238, 239 (D. Mass. 1925); *see also Caranica v. Nagle*, 28 F.2d 955, 957 (9th Cir. 1928) (holding that government must release alien if government fails to execute order of deportation "within

exigencies are clearly not present in the instant case.  We are not operating in a declared state of emergency nor has there been any suggestion to this court that Rosales poses a threat to our national security.

Moreover, while the government argues for absolute judicial deference to its plenary power over immigration policies, it is clear to this court that Congress may not authorize immigration officials to treat excludable aliens with complete impunity.  For example, the INS may not, consistent with the Constitution, execute an excludable alien should it be unable to effect his prompt deportation.  It is also evident that Congress cannot authorize the infliction of physical torture upon an excludable alien while he is detained in federal prison.  *See Gisbert*, 988 F.2d at 1442; *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987) (excludable aliens "are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials").  Consequently, we emphatically reject the government's premise that excludable aliens are completely foreign to the Fifth Amendment of the Constitution.[27]  We therefore find ourselves asked to draw a line of constitutional dimension between the act of torturing an excludable alien and the act of imprisoning such an alien indefinitely.  We do not believe that the Constitution authorizes us to draw such a line.  While it is true that aliens are not entitled to enjoy all the advantages of citizenship, *see Diaz*, 426 U.S. at 78, we emphasize that aliens — even excludable aliens — are "persons" entitled to the

---

a reasonable time").

[27]Other circuits have noted that excludable aliens possess some form of due process rights.  *See, e.g.*, *Chi Thon Ngo*, 192 F.3d at 396 ("Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process."); *Zadvydas*, 185 F.3d at 294 ("Excludable aliens are persons, entitled to some due process, and other, constitutional protections."); *Lynch*, 810 F.2d at 1366 (holding that "even excludable aliens are entitled to the protection of the due process clause while they are physically in the United States").

Rosales noted himself in his *pro se* brief to this court, even monthly review of his status would not change the fact that he will not be released until Cuba agrees to accept him, a prospect we have already discounted, or the Cuban Review Panel determines that his behavior comports with its guidelines such that it may offer him parole.  As we discussed earlier, because of the broad discretion bestowed upon the INS to grant and revoke parole, Rosales can never be certain of receiving such parole, no matter how well he behaves himself in detention.

Bearing in mind our obligation to weigh the government's stated interest in protecting the community from danger against the likelihood that the government will be able to effectuate Rosales's deportation, we conclude that Rosales's confinement can only be considered excessive in relation to the purpose of protecting the community from danger and enforcing an immigration order that is, at present, unenforceable.[32]  We believe that this case no longer implicates the government's plenary power to control the scope of our nation's immigration laws, namely its ability to enforce final orders of exclusion and deportation.  Judicial deference to the political branches' authority over immigration matters has always been premised on the paramount importance of our nation's self-determination and our national prerogative to control who enters our borders and on what conditions.  *See Aguirre-Aguirre*, 526 U.S. at 425 (noting that judicial deference "is especially appropriate in the

---

[32]Several district courts have reached the same constitutional conclusion with regard to deportable aliens.  *See Kay v. Reno*, 94 F. Supp. 2d 546, 553 (M.D. Penn. 2000); *Le v. Greene*, 84 F. Supp. 2d 1168, 1175 (D. Colo. 2000); *Vo v. Greene*, 63 F. Supp. 2d 1278, 1285 (D. Colo. 1999); *Tam v. INS*, 14 F. Supp. 2d 1184, 1192 (E.D. Cal. 1998) ("At some point, indefinite detention of a deportable alien caused by an unenforceable INS order must intersect with the Constitution"); *Hermanowski v. Farquharson*, 39 F. Supp. 2d 148, 162 (D. R.I. 1999) (detention for over twenty-eight months with the promise of continued imprisonment for the rest of his life even though alien's country has refused to allow deportation constitutes governmental conduct that "shocks the conscience" in violation of the Fifth Amendment).

details are currently being negotiated; and (2) that the alien is among those whose repatriation the agreement contemplates. We believe that, because the government has superior access to information on our diplomatic negotiations with other nations, the burden appropriately rests on the government to demonstrate adequately to this court that there is a genuine likelihood that the alien is among those whom the home country will agree to take back.[31]

Moreover, we conclude that the fact that Rosales receives periodic review of his parole status does not affect the nature of his detention as indefinite. The district court determined that because the Cuban Review Plan calls for yearly consideration of a detainee's status, Rosales cannot characterize his detention as indefinite. J.A. at 92. According to the district court, "[h]is detention is not indefinite but is for only one year at a time; at the end of each year he has an opportunity to plead his case anew." J.A. at 92. Other courts have held similarly. *See Chi Thon Ngo*, 192 F.3d at 398 (finding prolonged detention permissible provided the appropriate provisions for parole are available); *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir. 1995) (*en banc*) (Mariel Cuban's detention is more like "a series of one-year periods of detention followed by an opportunity to plead his case anew"); *cf. Zadvydas*, 185 F.3d at 291 (noting that because a resident alien has the opportunity to be paroled by showing that he is no longer either a threat to the community or a flight risk, and because his case is reviewed periodically, his detention cannot be considered indefinite). However, as

---

[31]Although the dissent states that excludable aliens "*will not* or cannot go elsewhere," *see infra* p. 47 (emphasis added), we think it important to note that it has never been suggested to this court that Rosales has had the opportunity to be released to any third country. The dissent further states, *see infra* note 17, that "Rosales's habeas petition does not suggest that he or his relatives, who are living in Florida, have arranged for him to leave the United States. Instead, he wants to be released into this country." We seriously question how an alien who is in prison and unrepresented by counsel could ever "arrange" to leave this country, much less whether there is any evidence in the record that any other country will accept Rosales.

Constitution's most basic protections and strictures. We conclude that if Rosales is indeed being detained indefinitely, discussed *infra*, his Fifth Amendment interest in liberty is necessarily implicated.

### D. Rosales's Fifth Amendment Right to Liberty

The right to be free from bodily restraint, the right at issue in this case, is not a new liberty interest, but is at the heart of those interests protected by the Due Process Clause of the Fifth Amendment and available to all persons within our shores.[28] Rosales asserts that his continuing confinement without trial violates his substantive due process rights under the Fifth Amendment to the Constitution. He also argues that his procedural due process rights have been violated because he was not afforded certain procedural protections during his parole revocation hearing with the Cuban Review Panel. In response, the government urges that "it is undisputed that an alien who has been denied admission to the United States has no liberty interest that would entitle him to be at-large within our borders even temporarily." Appellee's Br. at 25. According to the government, once an alien has been found excludable his detention is a mere continuation of the exclusion that has been authorized by Congress. Because detention serves only to effectuate the exclusion order, there can be no limit on its length, other than a statutory limit, which Congress has not chosen to provide. S*ee* 8 U.S.C. § 1226(e) (1994).

The Due Process Clause is comprised of two components, one substantive and the other procedural. Substantive due process precludes "the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit

---

[28]We note that the Supreme Court decided *Mezei* before deciding a line of cases that expanded upon its conceptions of substantive due process, as well as cases that developed a framework for analyzing whether civil or regulatory confinement rises to the level of criminal "punishment" and thus violates a detainee's substantive due process rights.

in the concept of ordered liberty.'" *See United States v. Salerno*, 481 U.S. 739, 746 (1987) (citing *Rochin v. California*, 342 U.S. 165, 172 (1952); *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937)). Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

We construe Rosales's petition for habeas corpus relief to challenge his detention as impermissible punishment in the absence of a trial. The deprivation of a fundamental liberty interest comports with due process only if it is narrowly tailored to serve a compelling government interest. *See Flores*, 507 U.S. at 302. According to *Salerno*, in order to determine whether Rosales's detention constitutes an impermissible restriction on liberty or permissible regulation, this court must analyze whether the detention is imposed for the purpose of punishment or whether it may be considered merely incidental to another legitimate government purpose. *See Salerno*, 481 U.S. at 747. Unless Congress expressly provides that the purpose of the legislation is punitive, this court must determine whether there is an alternative purpose for the restriction. *See id.* Because the Supreme Court has found that deportation proceedings for resident aliens are civil actions that are not intended as punishment for unlawful entry into this country, we must conclude, for the purposes of this case, that Congress did not intend to punish excludable aliens by detaining them prior to removal from this country. *See AADC*, 525 U.S. at 491 ("While the consequences of deportation may assuredly be grave, they are not imposed as a punishment."); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) ("The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws."). If the detention is intended as legitimate regulation, as in this case, we must then determine (1) whether there is an alternative, non-punitive purpose which may rationally be assigned to the detention, and (2) whether the detention "appears excessive in relation

under discussion." J.A. at 57. No evidence was presented to this court that any agreement between the two nations was likely or even possible in the near future. Moreover, no evidence was presented that Rosales is among those Mariel Cubans who may be returned even if such an agreement were to be executed.

Because the government has offered this court no credible proof that there is any possibility that Cuba may accept Rosales's return any time in the foreseeable future, we are constrained to conclude that Rosales faces indefinite detention.[30] While other circuits have found that excludable aliens cannot demonstrate that they are being detained indefinitely because of the possibility that their home country will one day invite them back, *see Zadvydas*, 185 F.3d at 294 (holding that detention is not indefinite until there is a showing that "deportation is impossible, not merely problematical, difficult, and distant"); *Chi Thon Ngo*, 192 F.3d at 398 (concluding that "[i]t is extremely unlikely that the [Vietnamese] petitioner's detention will be permanent" because "[d]iplomatic efforts with Vietnam are underway, albeit at a speed approximating the flow of cold molasses"), we decline to impose such a standard on Rosales. We will not require an alien to demonstrate that there is no conceivable possibility that his home country will ever accept his return in order to prove that his or her detention is indefinite in nature. Due to the vicissitudes of national politics and the potential for change in international relations, no alien could ever surmount such a standard, as the government need only point to ongoing talks, as it has in this case, or the potential for renewed relations to defeat the alien's claim that his home nation has no interest in repatriating him. Instead, this court will require the government to demonstrate (1) that the alien's home nation and this government are engaged in diplomatic discussions which encompass a specific repatriation agreement whose

---

[30] Rosales has thus far been detained in immigration custody for over three years.

that mentally ill person may commit future crime if he is not indefinitely committed). Were Rosales a citizen, he would be entitled to be free once he served his sentence absent any new charges of criminal conduct, even if authorities believed him still to be a dangerous person capable of inflicting future harm on society.

Because Congress has bestowed on the executive the authority to determine whether an alien released from prison still presents a threat to society, however, such an alien may be detained after serving his sentence and prior to his deportation. This court does not dispute Congress's authority to grant the executive that power. However, we note that in one of its earliest immigration cases, the Supreme Court delineated between detention as a means to ensure deportation and detention as a method of punishment. In *Wong Wing*, the Supreme Court stated that "[w]e think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid." *Wong Wing*, 163 U.S. at 235. Implicit in the Supreme Court's opinion is the idea that the strength of the government's interest in protecting the community and enforcing its immigration laws must be considered in relation to the possibility that the government may actually achieve its goal to effect Rosales's deportation. With this admonition in mind, we turn to an evaluation of the likelihood of Rosales's return to Cuba in order to determine whether his civil detention is excessive in relation to the government's purpose in detaining him.

The government argues that Cuba's unwillingness to accept the return of its citizens does not affect Rosales's statutory or constitutional rights. Appellee's Br. at 18. We disagree. The government submitted an affidavit by Michael Ranneberger, the Coordinator of the Office of Cuban Affairs in the State Department, detailing this country's negotiations with Cuba for the return of Mariel Cubans. Ranneberger's testimony reveals clearly that little progress on repatriation has been made in over fifteen years of talks. Ranneberger could only assert that the issue of repatriating Mariel Cubans "remains

to the alternative purpose assigned [to it]." *Salerno*, 481 U.S. at 747 (internal citation omitted).

Bound by this analytical framework, we first consider whether the government has articulated an alternative purpose, other than punishment, that is rationally related to Rosales's detention. The government has identified its interests in detaining Rosales as the need to protect society from a person who poses a danger to the safety of other persons or to property pursuant to 8 U.S.C. § 1226(e) (1994).[29] As we note *infra*, we do not dispute that Rosales's detention is rationally related to this alternative purpose. Our analysis focuses on the second prong of the *Salerno* test: evaluating whether Rosales's detention appears excessive in relation to the alternative purpose such that it violates his Fifth Amendment interest in liberty. In order to evaluate the question of excessiveness, we must balance the government's stated purpose against the likelihood of Rosales's deportation.

The Due Process Clause clearly does not grant a person an absolute right to be free from detention, even when convicted of no crime. *See Salerno*, 481 U.S. at 748; *see also Schall v. Martin*, 467 U.S. 253, 281 (1984) (permitting pretrial detention of juvenile delinquents considered dangerous); *Bell v. Wolfish*, 441 U.S. 520, 535-40 (1979) (allowing pretrial detention of arrestee if court finds there is risk of flight); *Carlson v. Landon*, 342 U.S. 524, 537-42 (1952) (allowing detention of Communist aliens pending deportation because they posed threat to nation's public interest). In *Salerno*, the Supreme Court upheld the Bail Reform Act against a challenge asserting that pretrial detention of prisoners

---

[29]Other courts have identified additional purposes for detention including: the government's ability to enforce deportation or exclusion orders; and preventing an alien's flight prior to deportation. *See Hermanowski v. Farquharson*, 39 F. Supp. 2d 148, 159 (D.R.I. 1999); *Phan v. Reno*, 56 F. Supp. 2d 1149, 1155-56 (W.D. Wash. 1999); *Vo v. Greene*, 63 F. Supp. 2d 1278, 1285 (D. Colo. 1999). However, because the government identified only safety to persons and property as its rationale for Rosales's detention, we confine ourselves to evaluating this interest.

amounted to a deprivation of the prisoners' liberty in violation of the Fifth Amendment. Noting that Congress's stated goal in enacting the Bail Reform Act was to protect the community from dangerous persons likely to commit crime prior to trial, the Court held that "preventing danger to the community is a legitimate regulatory goal" and the Act was rationally related to that goal. *Salerno*, 481 U.S. at 747; *see also Martin*, 467 U.S. at 264 ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."). However, the Court explicitly acknowledged that length of detention could contribute to a finding of excessiveness when it observed that, at some point, "detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *See Salerno*, 481 U.S. at 747 n.4. In its conclusion that the Bail Reform Act did not cross that point, the Court emphasized that the Act "limits the circumstances under which detention may be sought to the most serious of crimes." *Id.* at 747. Among the factors contributing to its conclusion, the Court noted that the government must demonstrate probable cause that the arrestee committed the charged crime; the government must prove by clear and convincing evidence that the arrestee presents an identified and articulable threat to an individual or the community; the arrestee is entitled to a prompt detention hearing at which he may be represented by counsel and has the right to testify, present evidence and cross-examine witnesses; and the Speedy Trial Act strictly limits the amount of time an arrestee may be detained prior to trial. *See id.* at 747-51. Thus, the *Salerno* Court, carefully delineating the contours of permissible detention, held that a finding of dangerousness alone is not enough to justify civil pretrial detention without assurances that the detention is of finite and limited duration.

Just as the Supreme Court concluded in *Salerno*, we recognize that Rosales's detention is rationally related to the government's non-punitive purpose of protecting public safety. Our concern is whether Rosales's detention, rationally related though it may be to the government's purpose, is unconstitutionally excessive when compared with the

indefinite nature of his confinement. Detention to effectuate deportation is arguably analogous to detention prior to criminal trial. Although Rosales has never committed a crime of violence, he has compiled a fairly long and progressively more serious criminal record. The government's interest in detaining Rosales to protect the community from harm is perhaps similar to the government's interest in detaining a violent arrestee prior to trial who presents a safety risk to the community should he be released. As the Supreme Court held in *Salerno*, "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S. at 748. However, in this case, there are no protections similar to those in *Salerno* for aliens who are detained while the government attempts to effect their deportation. *Cf. Foucha*, 504 U.S. at 82 (indefinite civil commitment of mentally ill persons is unconstitutional because, unlike in *Salerno*, the detention is not limited in duration); *Martin*, 467 U.S. at 269-70 (pretrial detention of juveniles is constitutional because it is "strictly limited in time" and juveniles receive an array of procedural protections during detention such that juvenile may not be detained more than seventeen days). As the government has repeatedly emphasized, there are no limits on the length that the Attorney General may, under 8 U.S.C. § 1226(e) (1994), detain an excludable alien released from prison once the Attorney General concludes that the alien presents a danger to persons or property.

Moreover, we note that in this case, unlike in *Salerno*, Rosales has served his prison sentence for the crime with which he was charged and to which he pleaded guilty. The district court judge set the length of Rosales's sentence pursuant to the United States Sentencing Guidelines, and Rosales paid his debt to society in due course. Should Rosales commit another crime upon his release, there is no reason why he could not be charged, prosecuted, and convicted for that crime. His sentence would undoubtedly reflect his recidivist tendency. *Cf. Foucha*, 504 U.S. at 82 (noting that society's "normal means of dealing with persistent criminal conduct" is sufficient arsenal against threat